IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 4, 2018 Session

## IN RE MELINDA N.

**Appeal from the Circuit Court for Bradley County**
**No. V-15-593     J. Michael Sharp, Judge**

_____

### No. E2017-01738-COA-R3-PT

_____

Candy D. ("Mother") appeals the August 11, 2017 order of the Circuit Court for Bradley County ("the Trial Court") terminating her parental rights to the minor child Melinda N. ("the Child"). Mother raises issues regarding whether a petition for adoption of the Child is defective on its face, whether the Trial Court erred in finding clear and convincing evidence that grounds existed to terminate her parental rights for abandonment by willful failure to support pursuant to Tenn. Code Ann. § 36-1-113(g)(1), whether the Trial Court erred in finding clear and convincing evidence that grounds existed to terminate her parental rights for abandonment by willful failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1), and whether the Trial Court erred in finding that it was in the Child's best interests for Mother's parental rights to be terminated. We find and hold that the Trial Court did not err in finding that clear and convincing evidence was shown of grounds to terminate Mother's parental rights for abandonment by willful failure to support and for abandoment by willful failure to visit and that it was proven that it was in the Child's best interests for Mother's parental rights to be terminated. We, therefore, affirm the Trial Court's August 11, 2017 order. As Mother's parental rights properly have been terminated, Mother lacks standing to raise issues regarding alleged deficiencies in the petition for adoption.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Barrett T. Painter, Cleveland, Tennessee, for the appellant, Candy D.

Jerry Hoffer, Cleveland, Tennessee, for the appellee, Christa D.

# OPINION

## Background

The Child was born in 2005. During the first few years of her life, the Child lived with Mother and Robert N. ("Father") in a house that Mother and Father were purchasing. Mother and Father lost the house to foreclosure in 2011 and moved out of it in 2012. From January of 2012 through July of 2012, Mother, Father, and the Child lived in a room at a Howard Johnson Hotel ("the Hotel") paid for by Father's sister, Christa D. ("Aunt").

In July of 2012, a dependency and neglect action was filed, and the Child was removed from Mother's and Father's custody.[1] After being removed from her parents' custody, the Child lived for several months with her adult half-brother, Bobby N. ("Brother") and his fiancée before moving in with Aunt and Aunt's husband, Shane D. ("Uncle").

In August of 2015, Aunt filed a Petition for Adoption seeking to terminate Mother's and Father's parental rights to the Child so that Aunt could adopt the Child. The case was set for trial in July of 2016. In July of 2016, just before trial, Father committed suicide. The case was re-set and proceeded against Mother. Trial was held in May of 2017.

Mother was 48 years old at the time of trial. She testified that although she and Father never married, they were involved in a relationship continuously and exclusively without separations from 2003 up to the time of Father's death. From 2003 through 2012, Mother and Father lived in a house that they were purchasing. Mother stated that Father had the house before she moved in with him. Mother testified that she stopped working when she was pregnant with the Child in 2005. Mother testified that she did not work after the Child was born. Father did work, and he supported them. When Mother was questioned about losing the house to foreclosure in 2012, she testified that she and Father actually lost the house to foreclosure in 2011, but they did not move out of the house until 2012.

Mother testified that from January 27, 2012 through July 17, 2012, she, Father, and the Child lived at the Hotel. The Child was seven years old at that time. Mother and Father also kept two dogs in the Hotel room, which Mother stated were part pit bull. Mother testified that Aunt paid for their room at the Hotel the entire time that Mother and

---

[1] The dependency and neglect action was filed by Aunt, Brother, and Father's mother.

Father stayed there. Aunt owns a restaurant in a space she leases from the Hotel. Neither Mother nor Father worked while they resided at the Hotel.

Mother was asked how they got groceries when they lived at the Hotel, and she stated:

> Well, [Aunt] had that restaurant . . . at [the Hotel] and she would actually - - there for a while she would fix us something of an evening and that's how we would eat. And then later on, well, then we would pick up scrap and cans and stuff and then we would buy our own food.

The Child was on the free and reduced meal program, and she ate breakfast and lunch at school.

A dependency and neglect action was filed in July of 2012, and the Child was removed from Mother's and Father's custody. Mother and Father were drug tested in July of 2012 after the dependency and neglect petition was filed. Father tested positive for methamphetamine, amphetamines, extended opiates, Hydrocodone, and Oxycodone. Mother tested positive for extended opiates, Hydrocodone, and Oxycodone. Mother testified that she had a prescription for the Hydrocodone but did not have one for the Oxycodone. Mother stated that the Oxycodone was Father's. The Juvenile Court found the Child to be dependent and neglected.

Father had a history of methamphetamine use. Mother testified that he went to rehab in 1996. When Father was hurt on a job in 2012, he started using methamphetamine again. Father lost his job when he was injured. Mother admitted that she "did find out about [Father's methamphetamine use], yes."

Mother testified that she had a bad back and that she saw Dr. Ford and obtained prescription medication. Mother was not seeing Dr. Ford at the time of trial. Mother claimed she no longer takes any pain medication. When asked if her condition had been alleviated by some sort of medical procedure, Mother stated that her condition had not resolved at all. She stated: "I still work. I work with pain. I work just fine." Mother claimed she stopped taking medication in December of 2012.

Mother testified that from July of 2012 through November of 2012, she and Father lived in a two-bedroom apartment with her sister. After that, Mother and Father lived in a two-bedroom apartment for three years and paid $160 per week in rent.

At the time of trial, Mother lived in a two-bedroom trailer where she had lived since October of 2015. Mother testified that she lives alone. Her rent is $100 per week.

3

Mother recently signed a contract to purchase a house. Mother applied for a loan to purchase the house. She testified that her loan has been approved. Mother stated that the closing date is set for "[n]ext Friday."

Mother began working at McDonald's in October of 2013. She made approximately $1,400 that year. In February of 2014, Mother began working at Exemplary Foam South. She made approximately $14,000 in 2014. Mother received a tax refund of approximately $1,000 in 2015. She was asked what she did with that money, and she stated: "That's part of the money that I used. . . . To help to get everything started to get our visitation."

Mother testified that she added the Child to her health insurance when she worked at Exemplary Foam South, but Mother never provided the insurance card to Aunt. Mother stated that she could not provide the insurance card to Aunt because she did not want to violate a court order, but she then admitted that she violated another court order when she failed to obtain an alcohol and drug assessment.

Mother admitted that there were court orders ordering her to get an alcohol and drug assessment, and she never has done that. When asked why she had not had an assessment Mother stated: "After a certain period of time lapsed, you know, what was the point? I was having clean drug screens, several." Mother admitted that she took no drug screens in 2013 or 2014. Mother had a hair follicle test in May of 2015 that was negative.

Mother lost her job at Exemplary Foam South in May of 2015 due to a "dispute with another employee." Mother began working at Rubbermaid in January of 2016. In the interim between these two jobs, Mother was unemployed.

At the time of trial Mother was employed at Rubbermaid. Mother works the day-shift forty hours per week and makes $10.83 per hour. She testified that she also has benefits. Mother testified that the Child is covered under Mother's health insurance. Mother testified that she had to undergo a background check and a hair follicle test in connection with her employment. The background check showed no criminal charges, and the drug screen was negative.

Mother testified that she went to see attorney Susie Starnes in December of 2012 concerning the Child. Attorney Starnes told Mother that she needed to be absolutely clean, with no drug use, be at the same address for at least six months, and obtain a job and then return to see her.

Mother testified that she had a "[v]ery good" relationship with the Child when the Child was in her custody. Mother, however, has had no contact with the Child since the Child was removed from her custody in 2012.

In April of 2015, Mother and Father filled out an intake sheet through the visitation center for supervised visitation. Mother admitted she knew that she had the right to supervised visitation and also knew she did not need to have an attorney to have supervised visitation. Mother was asked if she was stating that she knew in 2012 that she could have supervised visitation but failed to do anything to obtain the supervised visitation until 2015, and she stated: "Yes, sir. We were trying to get ourselves together before we added our child into." Mother admitted that even though a court order provided that she was entitled to unsupervised visitation if she could produce a clean drug screen, Mother never took a drug screen for litigation-related purposes until May of 2015. She stated: "No, sir. There was no need."

Mother admitted that she did not contact the visitation center until April of 2015. She was asked why she had not tried to see the Child earlier, and she stated:

At that time I did not have a job. I didn't have a phone to contact, you know, the visitation place or anything like that. So, whenever she said that we had to save up $2500, once I did get a job I put my checks in the bank. And I got paid once every two weeks and I had them collect into the bank until we got that money and were able to do the supervised visitation, pay the fees that we needed to pay, get a lawyer, and all that.

Mother admitted she paid no cash support to Aunt for the Child until June 3, 2016. She also admitted that she lived with Father during the years between when the Child was removed from her custody and June of 2016 and that she worked during that time period.

Mother was asked why she waited until June of 2016 to give Aunt money for the Child. Mother stated that she learned when she gave her deposition that she was "able to talk to [Aunt] without going to jail." Mother was asked how she was informed of this fact, and she stated: "What had happened was [Aunt] had actually contacted [Father] because of their father was having trouble, and I had text back." Mother testified that she still was making regular child support payments of "[a] hundred and one," up to the time of trial.

Mother has a son who is 27 years old. Mother's son lived with her, Father, and the Child prior to the Child's removal. Mother's son has not seen the Child since July of 2012. Mother testified that her son got married when he turned 18 in 2007. Mother admitted that she received child support for her son when he was a minor through Child

5

Support Services, and that she knew how that worked. She also admitted that she knew the importance of child support.

Mother's bank records for the year prior to the filing of the petition seeking to terminate her parental rights show that Mother was spending money to eat out and to purchase "vape." Mother stated: "I was trying to quit smoking, yes." The records also show that Mother took $300 in cash from her account every month. When asked what she did with that money, Mother stated: "It would probably be for him to, [Father], to go to the doctor because he had to pay to see his pain management." Mother was asked why she was giving Father cash when she was not working and he had an income of approximately $37,000, and she stated: "I was just trying to help him out." Mother admitted that during August of 2015 when her bank balance was dwindling because she was unemployed she spent $77 on vapors.

Attorney Ashley Gaither testified at trial. Mother and Father consulted her in April of 2015.[2] It was Attorney Gaither's understanding that when Mother and Father consulted with her they had not started the intake process for supervised visitations. Attorney Gaither discussed with Mother and Father the process and importance of having an alcohol and drug assessment done. Attorney Gaither told Mother and Father to get the intake started with CASA, and then she would follow up with CASA. Attorney Gaither followed up with CASA via email. Attorney Gaither testified that Mother and Father completed their part of the intake process, but visitation did not start. Attorney Gaither continued to communicate with CASA through November and December of 2015. After that time she had no further contact with Mother and Father.

Attorney Gaither was asked if Mother and Father were attempting to obtain visitation during the relevant four-month period, and she stated: "Very actively, yes. That was the initial purpose for us being retained so we did push pretty hard on that." After December of 2015, Mother and Father no longer could afford to pay Attorney Gaither to represent them in the termination proceeding. Attorney Gaither remembered that Mother had a job at one point and that Father also was working. Mother and Father did pay Attorney Gaither for her services.

The Child testified at trial. She was eleven years old at time of trial. The Child is home-schooled and is in the sixth grade. She has been home-schooled since the third grade. The Child attended second grade while she lived with Brother.

---

[2] Mother waived attorney/client privilege to allow Ms. Gaither to testify.

The Child testified that when they lived at the Hotel, Mother and Father did not work. She was asked what they did with their time, and she stated: "Stay at home, watch TV."

The Child testified that she was upset because Mother and Father did drugs with her brother Steven. She was asked how she knew this, and she stated: "Because my mom told me that it was drugs, but she said it wasn't anything bad." The Child knew what drugs were because Mother and Father told her about them. She stated that they told her: "That they might make them act a little bit different, but they were perfectly fine."

The Child testified that she saw cocaine. She stated that she saw her brother Steven with a bag of cocaine. It was a bag of white powder, and Mother told her: "It was cocaine, but it wasn't anything bad." The Child testified that she saw her brother: "Have a straw and put it up to his nose and snort it." Mother was right beside her brother when this happened, and Father also was present.

The Child testified that they also smoked pot while she was there. She knew it was pot "[b]ecause it was green." The Child testified that Mother told her "it was just stuff that would go into a cigarette." The Child stated that they would make the cigarettes themselves. She knew it wasn't tobacco because "they also bought tobacco at the store and they bought pot with one of my dad's friends." The Child testified that she witnessed Mother and Father purchasing drugs and that she saw Mother snort the white powder and smoke the green stuff. The Child testified that prior to moving into the Hotel she saw Mother do drugs once or twice. When questioned, Mother denied ever using cocaine or marijuana. Mother also denied doing drugs in front of the Child and denied telling the Child that it was okay.

The Child testified that when they lived at the Hotel she sometimes would not go to school: "Because my mom and dad wouldn't take me." The Child did not ask to go to school because at that time she did not know that she was supposed to go every day.

The Child testified that she lives with Aunt and Uncle. She has lived with them for approximately four and a half years. The Child likes living with her aunt and uncle. She feels safe and loved. Although the Child still loves Mother, she does not feel that she currently has a bonded relationship with Mother.

The Child was not aware that Mother was trying to get visitation started in April of 2015. If she had known that, the Child would not have wanted to see Mother and Father even in a supervised environment. The Child testified that Aunt never prevented her from seeing Mother or from calling or texting her. She testified that Aunt tells her

7

when Mother contacts Aunt. The Child never heard Aunt speak negatively about Mother. The Child does continue to see Brother, his wife, and their children.

Aunt testified at trial and explained that she was Father's sister. Aunt lives with her husband, her daughter, her son-in-law, her daughter's eight year old son, and the Child. Aunt described her relationship with the Child as "[v]ery, very close." When the Child lived with Brother, Aunt would pick up the Child from school every afternoon. Aunt testified that the Child loves Aunt's husband and calls him "Pops." The Child calls Aunt "Christa," but sometimes draws pictures for Aunt "that say, I love you, Mommy." Aunt testified that the Child and Aunt's grandson are "like brother and sister."

Aunt testified that she paid for the room when Mother, Father, and the Child lived in the Hotel. Aunt also provided them with food. Aunt testified that when Mother and Father vacated the hotel room: "I had the room fumigated several times to try to get rid of the fleas. That didn't work. I had to pay to replace the bedding, the beds, and the carpet and the padding and have the room cleaned because it was filthy."

Aunt and Mother began texting in April or early May of 2016. Aunt had contacted Father about their parents' property, and Mother subsequently texted Aunt pictures of the property. Eventually the texts became about the Child. Mother asked how the Child was and said that she and Father missed the Child. Aunt sent some pictures of the Child and commented that she had been wondering how long it would take them to ask about the Child given that Aunt had been in contact with Father since January of 2015. Aunt testified that it was a year and a half after she and Father began texting one another that Mother and Father asked about the Child. Aunt testified that the first time she received a call about visitation was in April of 2015.

The first child support payment Aunt received was the $1,000 that Mother gave to her after the depositions in June of 2016. Aunt received none prior to that. The Child has lived with Aunt since May of 2013. Mother has sent support payments "semi-regularly" since giving Aunt the $1,000.

Aunt filed the petition for adoption because her youngest daughter became engaged to an Australian citizen and moved to Australia. Aunt realized that she could not obtain a passport for the Child to visit Australia without Mother and Father signing off, and Aunt did not believe they would do so. Aunt learned about Father's suicide on the day trial was to occur, in July of 2015.

Uncle testified at trial that he has a "very good relationship" with the Child, and that the Child and his wife have "[a] very close, loving relationship." Uncle testified that

8

since the Child has lived under his roof "she has blossomed. I feel she's come out of her shell. I believe she's become a more open, lively little girl."

Brother testified at trial. He explained that the Child is his half-sister since they share the same Father. Brother was 23 years old at time of trial. He is married and has two children. When the Child first was removed from Mother's and Father's custody, she stayed with Brother and his then fiancée because the Child "really didn't know anybody else in the family that well. The only person she really knew was me, so it was kind of important for that first year to have her around someone she really knew - - . . . until she got acquainted more with them." Brother stays in regular contact with the Child.

Brother had not spoken to Father since two days before the Child was removed from Mother's and Father's custody. Brother had not spoken to Mother from that time until Father's funeral when he spoke with her for the first time in years. Father knew where Brother lived and had Brother's phone number.

After trial, the Trial Court entered its thorough Final Order on August 11, 2017 terminating Mother's parental rights to the Child after finding and holding, *inter alia*:

> This matter is before this court based upon the petition for adoption filed by the petitioner [Aunt], which was filed in this court on 8/11/2015. Therefore, for purposes of this order, the four month look back period began 4/11/2015. Prior to the final hearing, the respondent father, [Father], died. Therefore, the respondent mother, [Mother], is the only remaining respondent in this matter. The biological father [Father] and the biological mother [Mother] were never married.
>
> The primary issue in this case for the court to determine is whether or not the mother abandoned the minor child as defined by T.C.A. § 36-1-102. Specifically, the court must determine the issue of whether or not the mother has willfully failed to pay child support and/or whether or not there has been a willful failure by the mother to visit the child during the four month look back period, from 4/11/2015 through 8/11/2015? [sic] The mother's testimony, and a part of the theory of her case, is that she contacted Doug Wisdom of CASA and/or the Bradley County Supervised Visitation Center in 2015, so as to begin the process of obtaining her parenting time. In addition to that theory, the mother argues that because she did not have the funds in 2015 to pay any support during the four month look back period, therefore she did not willfully fail to pay support

9

for the child. The mother also put forth other theories that the court will discuss in this order. The court finds as follows:

This matter originated from the Bradley County Juvenile Court on or about July 16, 2012. At that time, a petition for dependency and neglect was filed by the petitioner herein, as well as the child's grandmother and brother. The allegations, at that time, were in effect that the parents had lost their home in a foreclosure sale in April of 2011, but were not forced to move out of the home until February of 2012. However, during a period from about September 2011 through February the 12th, it was alleged that the biological parents and the child were living in a home without any electricity, heat, water, and without any food. Furthermore, the petitioners alleged that the biological parents and the child moved into [the Hotel] . . . and were effectively living with their child in a motel room with two double beds, along with two pit bulls, all living together in the same room. The rent was being paid by [Aunt], the petitioner herein, who is the biological father's sister and the child's aunt. Furthermore, the allegation was that the child was being exposed to illegal drugs. There were additional allegations pertaining to the minor child's attendance problems at the local elementary school to which she was attending at that time. Ultimately, the petition alleged that the child would suffer immediate and irreparable harm if she were left in the custody of her biological parents, and furthermore, that the child was a dependent and neglected child. The Juvenile Court tested both the biological mother and father for illegal drugs and both tested positive, the mother for opiates, hydrocodone (for which she had a prescription) and oxycodone (for which she did not have a prescription). The father tested positive for both hydrocodone and oxycodone, neither of which he had a prescription for, as well as amphetamines and methamphetamine. The Juvenile Court found the child to be dependent and neglected as defined by T.C.A. § 37-1-102. The Juvenile Court granted custody of the child to the petitioners on July 16, 2012. By order of the Juvenile Court entered on 11/30/2012, the court found that neither of the respondents had paid any support, and the respondents had not taken new drug screens as previously ordered. The respondents presented no proof or evidence regarding their attendance at any alcohol or drug assessment program as previously ordered. Therefore, in the 11/30/2012 order, the court ordered that the petitioners should retain temporary custody. However, in that order, the court ordered that the respondent parents could have supervised visits at the Bradley County Supervised Visitation Center and Safe Exchange Program (with Doug and Suzanne Wisdom), and the court further ordered that the respondents

"shall" undergo an alcohol and drug assessment, and that the respondents "shall" follow all of the recommendations of the same. Furthermore, the court ordered that the respondent parents "shall" bring this matter back to the court at their pleasure. It is also noted in the 11/30/2012 order that the parties agreed that the child would stay in the custody of the petitioners. The respondent parents waived their right to an emergency hearing. Again, the court found the child to be dependent and neglected. The court further granted the respondents supervised visits, as set out above. The court further held that the respondents "shall" bring the matter back to court to determine if and when unsupervised visits were warranted should they be able to produce a clean hair follicle drug and urine drug screen. Finally, the court ordered that the respondents "shall" undergo an alcohol and drug assessment and follow the recommendations of the assessment.

This court finds that neither of the respondent parents ever had an alcohol and drug assessment done. The court further finds that neither of the parents went to have the intake assessment done at the Bradley County Supervised Visitation Center and Safe Exchange Program until 4/3/2015, nearly 18 months after the Juvenile Court's order, and more than 21 months after the child was taken from the respondent parents. The court heard the testimony of the child's brother, [Brother], who was one of the original petitioners. He is the child's brother and the biological son of the respondent [Father]. He testified that he had the child primarily in his custody for nearly the entire first year after the child was taken from the parents on 7/16/2012. [Brother] testified, very credibly, that neither parent ever once contacted him to check on the child and/or to inquire about the child's well being in any way. He further testified that neither parent ever paid any support, nor provided any gifts or any other items for or on behalf of the child during the first year after he received custody on 7/16/2012. He also testified that during his childhood and teenage years growing up in his father's home with [Mother] that illegal drugs were readily there and available from his earliest memories.

As noted above, the court finds that [Mother] did not go to the Bradley County Supervised Visitation Center and Safe Exchange Program (now known as CASA) until 4/3/2015. The court finds that there is some evidence that [Mother] relayed text messages back and forth from herself to Doug Wisdom, [sic] who was apparently the programs director at the time. However, there is no evidence before the court that the mother nor the father ever attempted to obtain any visitation or parenting time with the

minor child from July 2012 until the contact with CASA in April of 2015. The court finds that the contact after April 2015 was minimal.

The court heard the testimony of a local Cleveland, Tennessee attorney, Ashley Gaither, who testified that she met with the biological parents on 4/21/2015. This meeting occurred after the parents had apparently met with another local attorney, Susie Starnes, in December of 2014 and on 4/3/2015. Ms. Gaither testified that she, along with Attorney Starnes, consulted with the biological parents, and informed both parents that it was imperative, as well as being an order of the court, that an alcohol and drug assessment had to be done. Ms. Gaither testified that she informed the parents of the possibility of the termination of their parental rights, and she further informed them that proof of only one ground was all that was required in a termination of parental rights suit. Ms. Gaither testified that she informed both parents of the seriousness of this situation, and she informed them that it was imperative that they act immediately pertaining to their child. She testified that she informed both parents that it was imperative that they get the alcohol and drug assessment, previously ordered by the court, done immediately. She testified that she made both parents aware of the methods and/or various alternative ways to move forward with this matter. However, Ms. Gaither also testified that from 4/21/2015 through the end of December 2015, she had no other contact from either [Mother] or [Father].

With regard to this issue, [Mother] testified that she did in fact meet with Ms. Starnes and Ms. Gaither. She testified that she was made aware by both attorneys that she needed to find steady employment, a stable place to live, and that she would have to pass a drug screen, and that she needed to complete an alcohol and drug assessment. Trial exhibit #5 shows the list that [Mother] made during her meeting with attorney Starnes. The court finds that even after receiving the legal advice from both attorney Starnes and attorney Gaither, the mother did not produce any drug screen to the court that showed a clean drug screen, nor that she had taken a 5 panel drug test until 6/3/2015. The court specifically finds that the mother paid $1,500.00 to Ms. Gaither in April of 2015, which was also confirmed by Ms. Gaither's testimony. The court finds this shows that the mother did have the present ability to obtain counsel should she have chosen to do so. The court finds that the mother did not petition the court in 2013, 2014, or during the first part of 2015, even after having received what the court finds to be full and complete legal advice as to what steps were needed to accomplish the return of her child and/or to put herself back on a path to re-

establishing her relationship with her child. The court finds the mother's actions to be both willful and voluntary.

In June of 2015, the petitioner, [Aunt], received a call from Mr. Wisdom of the Bradley County Supervised Visitation Center and Safe Exchange Program. The petitioner testified that she spoke with Mr. Wisdom and cooperated with him in every way, answering all of his questions and providing the information that he requested, and that she was expecting a call back from Mr. Wisdom. However, the petitioner said that she never received any other call from Mr. Wisdom or anyone else from the Bradley County Supervised Visitation Center and Safe Exchange Program. [Aunt] testified that she never denied any visitation or parenting time to [Mother] nor to the father. [Aunt] further testified that she was simply awaiting further instructions and never heard another thing from the Bradley County Supervised Visitation Center and Safe Exchange Program, the father, nor [Mother]. The court finds [Aunt's] testimony to be very credible.

[Mother] testified that the reason she did not follow up on this matter initially was because she and [Father] were trying to get their lives in order. She testified that she was trying to save up money to obtain an attorney, and she testified that she ultimately blamed the Bradley County Supervised Visitation Center and Safe Exchange Program for not following up more quickly with her so as to arrange the parenting time. Even though, the court notes that she waited almost three years before she ever contacted the Bradley County Supervised Visitation Center and Safe Exchange Program. Furthermore, when questioned on cross examination, [Mother] admitted that she did not complete an alcohol and drug assessment, and to her knowledge neither did [Father]. She further admits that prior to 8/11/2015, she never paid any support from the time her child was removed from her home in July of 2012. She further admitted that she did not contact Mr. Wisdom until April of 2015, and further admitted that she had no visitation or contact with the child at all from 7/16/2012 through 8/11/2015. As the court found above, the mother obviously had the ability to pay her attorney in 2015. The court reiterates the fact that the mother had the ability to pay as shown by her payment of $1,500.00 to attorney Ashley Gaither in 2015. The court finds that the mother had the ability to pay child support, and the capability of earning money to pay her child support, but simply chose not to work and willfully chose not to pay child support. Furthermore, the court finds that the bank statement referenced above show [sic] that from the first part of 2015 through August of 2015 when the termination petition

was filed, the mother had a steady source of income, and actually had money saved. The court finds that despite this income and savings, the mother willfully failed to pay any child support. Additionally, the court finds that the mother used some of her earnings to pay for cigarettes and fast food purchases during the four month look back period and before. Furthermore, and in addition to all of the above, the court notes that the mother continued to pay $300.00 per month to the child's father. She testified this was to assist him with paying his tool payments each month. While the court is unsure of what the father may have done with the $300.00, the court is completely sure that the father continued to live a lifestyle involving the purchase and use of illegal drugs. The court is also sure, based upon the mother's candid testimony, that she was well aware of the fact that the father continued to use illegal drugs from before the time the child was taken in July of 2012 up through and including the time of the father's death. The court also finds that the mother was using illegal drugs that she did not have a prescription for during at least part of this time. The mother testified that the father was paying all of the parties['] bills from his own personal income. The court finds that the mother was well aware at all times of the father's ongoing drug use and drug addiction problem, and by her own admission continued to give him money on a regular basis while paying no support toward her child. Ultimately, the court finds the mother paid no support of any kind on behalf of or for the benefit of this child until June 2016, nearly one year after the original petition to terminate parental rights was filed. The court finds that it was not until after the deposition of June 3, 2016 that [Mother] began to pay child support. Furthermore, the court finds that [Father] never paid any child support. The court finds these actions on the part of the mother are both willful and voluntary.

During the time period from January to July 2012, the court finds that the parents and the subject child lived in [the Hotel]. During that seven month time period, the mother admits that she and her husband were living in the hotel room free of charge, based upon the fact that the petitioner [Aunt] was in fact paying their weekly room rental rate. Furthermore, the mother admits that during that time period, [Aunt] was also providing food to [Mother], [Father] and the child free of charge from her restaurant.

The court also heard the testimony of the petitioner pertaining to the condition of the mother and father's motel room at [the Hotel] when they moved out. [Aunt] testified that she was required to pay to replace all of the bedding, the bed itself, the carpeting, and the padding under the carpeting. Furthermore, [Aunt] was charged with having to have the room

14

fumigated two times. The court finds [Aunt's] testimony regarding these issues to be uncontradicted, and the court finds [Aunt's] testimony to be very credible.

[Mother] candidly admitted that during the seven months they lived in [the Hotel], neither she nor her husband were working, and she candidly admitted that she never applied for a job during that seven month period of time. The court also heard the testimony of the child, which the court will discuss in greater detail later in this order, however, the child testified that during that period of time while she and her parents were living in [the Hotel], that her parents did not work and simply sat around in the room most days watching television. The court finds that neither the mother nor the father paid any child support, by the mother's own candid admission, during 2012, 2013, 2014, and for the greater portion of 2015. The court finds that no child support of any kind was paid in 2015 during the four month look back period of time. The court finds that this non-payment of support was both willful and voluntary on the part of the mother. The court finds it important to note that the court received the bank records of [Mother] for the time frame from 2012 through 2015. The court notes that there were numerous expenditures for what the court considers to be non-essential items such as cigarettes, vapor cigarettes, fast food and other items. The court finds that [Mother] made no effort to pay any support nor to supply any gifts, cards, or anything else resembling support during the time period of July of 2012 through June of 2016. The court finds that [Mother's] joint tax returns filed with [Father] (see trial exhibit #2) shows [sic] that in 2014 and 2015 [Father] and [Mother] earned an income in excess of $40,000.00 combined for each of those two years. While the court recognizes that the mother's income was not a substantial portion of that combined income, the court notes that the mother did receive income and was in fact employed when the mother and father lived together and shared their income and expenses. More importantly, the court finds that the mother was entirely capable of working and chose to be unemployed during this period of time. The court finds that the mother candidly testified that there were no impediments, nor any reasons, that she was aware of, as to why she was unable to work or find a job, other than a possible transportation issue that she perceived was a potential problem. However, the court finds there is no proof that the mother could not work or could not have received adequate transportation had she attempted to or chosen to work. The court finds that the mother's income tax returns of 2013, 2014 and 2015 (see trial exhibit #1) exhibits [sic] to the court that the mother had the ability to work and to be gainfully employed when she

15

chose to do so. Therefore, based upon the above, the court finds the mother had at all times the present ability to pay child support, which she simply chose not to do until after having given her deposition in June of 2016. The court finds this to be well after the four month look back period between April and August of 2015.

The mother argued that she did in fact pay a form of child support by the fact that she had a United Healthcare Insurance plan dated May of 2015, which occurred during the look back period. However, [Aunt] testified that the insurance card was never provided to her, nor was the insurance card ever mentioned to her until after she had filed this proceeding. [Aunt] testified that the insurance card was not only never delivered to her, she testified that the child never received any benefits from the insurance card. The court has no facts or evidence to prove that [Aunt] nor anyone else was aware of the fact that there might have been insurance benefits for the use and benefit of the child. The court finds [Aunt's] testimony regarding this issue to be credible. [Mother] testified that she did not deliver the insurance card nor call [Aunt] about the card because she was afraid she would be in violation of a court order. However, the court take [sic] notice of the fact that [Mother] chose to violate the court's orders pertaining to her alcohol and drug assessment as well as other items. The court has great questions concerning the credibility of [Mother] on this, any [sic] many other issues.

Based upon all of the above, the court finds by clear and convincing evidence that there has been a complete, willful failure to pay any child support and/or to support this child in any way during the applicable look back period. Furthermore, the court finds that there has been a total and complete failure to pay any support actually from the date the child was removed from her biological parents in July of 2012 through the date this petition for adoption was filed on 8/11/2015.

The court finds by clear and convincing evidence that there has been a complete, willful and voluntary abandonment by both the mother and the father due to their failure to visit the child during the four month look back period prior to the filing of this petition for adoption on 8/11/2015. Furthermore, the court finds by clear and convincing evidence that there has been a complete and willful failure to visit from the date the child was removed from the parents['] home in July of 2012 through the date of the filing of this petition for adoption on 8/11/2015. Specifically, the court finds the testimony of the child's brother, [Brother], to be very moving in

16

that he never heard anything during the entire first year from the mother or the father. The court would hope that biological parents would do all within their power, or immediately upon having their child removed, to take whatever steps necessary to reunite with their child. The evidence in this case shows that this did not occur, not only for the first year immediately after the child was removed in July of 2012, but all the way through and including up to the time in August of 2015 when this petition for adoption was filed. The court finds by clear and convincing evidence the mother's failure to visit was willful and voluntary.

Of great importance to the court was the testimony of the child. The court finds the testimony of the child to be extremely moving. The child, who is now age 12, was removed from her parents when she was 7 years old. The child testified that she remembered, very well, living at [the Hotel] with her mother and her father for a period from six months to one year long. The child testified that she remembered prior to [the Hotel], living in the home with her mother and her father, and the home having no electricity, no water and no heat. The child testified that during a portion of the time that she lived in the home referenced above, and during all of the time she lived at [the Hotel], neither of her parents worked. The child testified that her parents simply just stayed at home and watched television all day. Part of the child's testimony pertained to her personal observation of her parents' drug habits. This testimony was particularly moving to the court. The child testified that she saw her parents, and other adults, one of whom was her brother Steven, using illegal drugs on numerous occasions. The child testified that her mother and her father told her about drugs. She testified that both of her parents told her that it was okay to do drugs and/or what they were doing was okay. The child specifically testified that she saw her brother Steven and her mother using a white powder on different occasions. She testified that she asked her mother about the white powder and her mother told her that it was cocaine but her mother told her what she was doing was okay what she was doing [sic]. Additionally, the child testified that she saw her mother and her father, as well as other adults joining her mother and father, smoking something that her parents told her was "pot". She testified that the substance was green and that she saw her parents receive the pot from some of her father's friends who would come over to their house or [the Hotel]. She testified that she saw her father give different people money for the pot, and that the people would in return give her father or mother a bag of pot. Again, she testified that she spoke with her mother and father about the pot, and they told her that it was okay. Finally, with regard to the numerous missed dates from school and/or

17

absences, the child testified that some days she was sick, but that there were lots of times that her mother and father simply wouldn't take her to school, nor did they make her go to school.

Finally, the child was asked whether or not she wanted to see her mother, and the child's response was no. The child testified that she had no desire to see her mother nor to be around her. When asked if the child wished to be adopted by the petitioner, the child replied very adamantly yes. The child testified that she had no bond with her mother, and she was doing well and was happy where she was at, and enjoyed being a part of that family and wished to remain a part of that family.

The court has found that statutory grounds to terminate the mother's rights exist in this case by clear and convincing evidence. Based upon this finding, it is now the petitioner's responsibility to prove by clear and convincing evidence that it is in the best interest of the child to terminate the respondent's parental rights pursuant to T.C.A. § 36-1-113(i)(1-9):

\* \* \*

Based upon all of the specific findings of fact set out above, the court finds that no meaningful relationship exists between this child and [Mother]. Furthermore, the court finds that this situation has been brought about by the willful actions of the mother.

The court finds, based upon all of the above, that this child would suffer emotional and psychological harm if there was a change of caregivers in her life at this point in time. The court finds this child has been away and outside of her mother's home since July of 2012, and the court finds that the child has been a part of the petitioner's family for a period of more than four years. The court finds, based upon both the petitioner and the child's testimony that there is a strong, loving and meaningful relationship between the child and the petitioner and the petitioner's family members. The court finds this child considers the petitioner's home as her home. The court finds that this child has become fully integrated in the petitioner's home and family, and has formed a strong and positive bond with the petitioner and her immediate family. Based upon this, the court finds that this child would suffer both emotionally and psychologically if she were removed from the petitioner's home. Based upon all of the above, the court finds that it is in the best interest of this child to terminate the parental rights of the respondent

18

mother. Furthermore, the court finds it is in the best interest of this child to be adopted by the petitioner. All of these findings are by clear and convincing evidence.

The petitioner herein, [Aunt], testified that the child is doing well in school, the child is deeply involved with she and her husband and their family. She as well as the child's grandmother (the mother of the biological father) testified that the child is extremely well grounded, very active in her church and extra-curricular activities, and the child has found a place to thrive in the petitioner's home. The court finds that the child is thriving in the petitioner's home, and the court finds that the child is thriving with the petitioner, her husband and her family. Based upon all of the above, the court finds that it is without question in this child's best interest to remain with the petitioner, and that the petitioner be allowed to adopt this child. All of these findings of fact and conclusions of law are made based upon what the court finds to be the clear and convincing evidence as set out herein.

Mother appeals the termination of her parental right to this Court.

## **Discussion**

Although not stated exactly as such, Mother raises five issues on appeal: 1) whether the Petition for Adoption is deficient on its face; 2) whether the Trial Court erred in finding that clear and convincing evidence had been shown of grounds to terminate Mother's parental rights to the Child for abandonment by willful failure to support pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i); 3) whether the Trial Court erred in finding that clear and convincing evidence had been shown of grounds to terminate Mother's parental rights to the Child for abandonment by willful failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i); 4) whether the Trial Court erred in finding persistent conditions existed, which were not likely to improve as to Mother; and, 5) whether the Trial Court erred in finding that it had been proven by clear and convincing evidence that it was in the Child's best interests for Mother's parental rights to be terminated.

With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected

by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

21

receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate

parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Mother alleges in her first issue that the Petition for Adoption is deficient on its face for three specific reasons. First, she alleges that the Child was born out-of-wedlock and that Aunt provided no proof of Aunt's relationship to the Child, yet Aunt requested waiver of a home study, which only would be allowed for a relative. Second, Mother alleges that Aunt failed to attach the consents of the other two adults who share legal custody of the Child, and consent of all legal custodians is necessary for an adoption. Third, Mother alleges that the Petition for Adoption is deficient because Aunt's husband failed to join in the petition. These alleged deficiencies all concern the adoption portion of the proceeding and not the portion of the proceeding seeking to terminate Mother's parental rights. None of these alleged deficiencies concern the actual petition to terminate Mother's parental rights.

As pertinent to this issue, Tenn. Code Ann. § 36-1-113(l) provides:

(l)(1) An order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian. The parent or guardian shall have no further right to notice of proceedings for the adoption of that child by other persons and shall have no right to object to the child's adoption or thereafter to have any relationship, legal or otherwise, with the child. It shall terminate the responsibilities of that parent or guardian under this section for future child support or other future financial responsibilities even if the child is not ultimately adopted; provided, that the entry of an order terminating the parental rights shall not eliminate the responsibility of such parent or guardian for past child support arrearages or other financial obligations incurred for the care of such child prior to the entry of the order terminating parental rights.

Tenn. Code Ann. § 36-1-113(l)(1) (2017).

If Mother's parental rights were terminated properly, Mother would lack standing to challenge a petition for adoption of the Child. As the alleged deficiencies in the petition concern only the adoption portion of the proceeding and not the parental termination portion, we first must consider whether Mother's parental rights to the Child were terminated properly, which leads us to consideration of Mother's remaining issues on appeal.

We begin by considering whether the Trial Court erred in finding that clear and convincing evidence had been shown of grounds to terminate Mother's parental rights to the Child for abandonment by willful failure to support pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i).

As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2017). As pertinent to this issue, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

24

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017)[6].

As this Court explained in *In re: Alysia S.*:

"The requirement that the failure to visit or support be 'willful' is both a statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004–00986–COA–R3–CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005). Therefore, the element of willfulness is essential and central to the determination of abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*, No. E2005–00328–COA–R3–PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

Willfulness of a parent's conduct depends on the parent's intent, and intent is seldom capable of direct proof. *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re Adoption of S.M.F.*, No. M2004–00876–COA–R9–PT, 2004

---

[6] The statute was amended in 2018 as this Court explained in *In re Gabriel B.*:

The statute defining "abandonment" was amended effective July 1, 2018, and as amended, Tenn. Code Ann. § 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment." Instead, Pub. Ch. 875, § 2, codified at Tenn. Code Ann. § 36-1-102(1)(I), makes the absence of willfulness an affirmative defense to abandonment for failure to visit or support. The parent (or guardian) will have to prove by a preponderance of the evidence that the failure to visit or support was not willful. Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case. *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004).

*In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *15 n.7 (Tenn. Ct. App. July 23, 2018), *no. appl. perm appeal filed*. As the 2018 amendments do not apply retroactively, we apply the version of the statute in effect at the time of the filing of the petition in this case.

WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004)). Triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *Id.* Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are best situated to make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d at 367. The question of intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness. *V.D. v. N.M.B.*, No. M2003–00186–COA–R3–CV, 2004 WL 1732323, at *6 (Tenn. Ct. App. July 26, 2004). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

*In re: Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014).

With regard to this issue, the Trial Court found that Mother admitted that she paid no child support whatsoever from the time the Child was removed from her custody until after the petition for adoption was filed. The Trial Court further found that Mother had "the ability to pay child support, and the capability of earning money to pay her child support, but simply chose not to work and willfully chose not to pay child support." Furthermore, the Trial Court found that "from the first part of 2015 through August of 2015 when the termination petition was filed, the mother had a steady source of income, and actually had money saved," but "despite this income and savings, the mother willfully failed to pay any child support." Additionally, the Trial Court found that Mother used some of her earnings to purchase cigarettes and fast food during the four month period preceding the filing of the petition to adopt. The Trial Court also found that Mother continued to give $300 per month to Father. The Trial Court then stated that while it was unclear what Father did with that money, the Trial Court was "completely sure that the father continued to live a lifestyle involving the purchase and use of illegal drugs." The Trial Court specifically stated: "Ultimately, the court finds the mother paid no support of any kind on behalf of or for the benefit of this child until June 2016, nearly one year after the original petition to terminate parental rights was filed." The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Trial Court by clear and convincing evidence.

Mother argues in her brief on appeal that her case is similar to the case of *In re: Alysia S.* in which this Court reversed a finding of grounds to terminate for willful failure to provide support because the "evidence does not support a finding that Mother willfully or 'intentionally abandoned' [her child]." *In re: Alysia S.*, 460 S.W.3d 536, 572 (Tenn.

Ct. App. 2014). Mother argues in her brief that: "In light of [Mother's] efforts to obtain employment, to become self-supportive, to pay the expenses necessary to regain custody and/or visit with her minor child, to save $1,000 to pay for child support, the health insurance coverage [Mother] obtained for the child, [Aunt] failed to prove by clear and convincing evidence that [Mother] willfully failed to support the child during the four-month period immediately preceding the filing of the Petition." In essence, Mother appears to be arguing that like the mother in *In re: Alysia S.* she "was spending a substantial portion of her limited financial resources to do the things [necessary to regain custody]," and, therefore, her failure to pay child support was not willful. *In re: Alysia S.*, 460 S.W.3d at 572.

Mother's case, however, is easily distinguishable from *In re: Alysia S.* In *In re: Alysia S.*, this Court found that the evidence presented was simply not clear and convincing that "[the mother] worked at [her job] during the four-month period, received her paycheck from that employment during the four-month period, and therefore had the capacity to pay monetary child support during the four-month period but willfully failed to do so." *In re: Alysia S.*, 460 S.W.3d at 569.[7] In the case now before us on appeal, the evidence was clear and convincing, as found by the Trial Court, that Mother worked at Exemplary Foam South during the first portion of the four-month statutory period and after losing her job at Exemplary Foam South was unemployed until January of 2016. The record is devoid of evidence that Mother made any attempt to obtain employment in the interim between these two jobs. The Trial Court found "that the mother had the ability to pay child support, and the capability of earning money to pay her child support, but simply chose not to work and willfully chose not to pay child support." The evidence in the record on appeal also shows that during the relevant four-month period Mother had money saved and "used some of her earnings to pay for cigarettes and fast food purchases . . . ." Furthermore, the evidence in the record on appeal shows that despite being unemployed and having dwindling savings, Mother continued to give Father $300 per month. Additionally, Mother herself admitted that she was aware of the necessity of paying child support. These facts are very different from the facts in *In re: Alysia S.* wherein the mother struggled to pay her bills and "[attempted] to comply with the DCS plan and court orders . . . ." *In re: Alysia S.*, 460 S.W.3d at 568. The record in the case now before us on appeal is devoid of evidence that Mother struggled to meet her bills during the relevant time period. In fact, to the contrary, it shows that Mother was able to purchase such luxury items as cigarettes and fast food during the relevant time period. The facts in the case now before us on appeal are not analogous to the facts in *In re: Alysia S.* As such, we do not find *In re: Alysia S.* to be pertinent to our analysis in the case now before us on appeal.

---

[7] Importantly, in *In re: Alysia S.*, the evidence showed that Mother was not willfully unemployed, but had a hard time finding a job and was doing her best to find employment. *In re: Alysia S.*, 460 S.W.3d at 566-69.

The evidence in the record on appeal does not preponderate against the Trial Court's finding by clear and convincing evidence that "the mother had the ability to pay child support, and the capability of earning money to pay her child support, but simply chose not to work and willfully chose not to pay child support." Given this, we find no error in the Trial Court's finding that grounds to terminate Mother's parental rights for abandonment by willful failure to provide support was proven by clear and convincing evidence.

We turn next to Mother's issue regarding whether the Trial Court erred in finding that clear and convincing evidence had been shown of grounds to terminate Mother's parental rights to the Child for abandonment by willful failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i). As we quoted the applicable statutory sections above, we will not reiterate them.

With regard to this issue, the Trial Court specifically found that:

> As noted above, the court finds that [Mother] did not go to the Bradley County Supervised Visitation Center and Safe Exchange Program (now known as CASA) until 4/3/2015. The court finds that there is some evidence that [Mother] relayed text messages back and forth from herself to Doug Wisdom, [sic] who was apparently the programs director at the time. However, there is no evidence before the court that the mother nor the father ever attempted to obtain any visitation or parenting time with the minor child from July 2012 until the contact with CASA in April of 2015. The court finds that the contact after April 2015 was minimal.
>
> * * *
>
> [Mother] ultimately blamed the Bradley County Supervised Visitation Center and Safe Exchange Program for not following up more quickly with her so as to arrange the parenting time. Even though, the court notes that she waited almost three years before she ever contacted the Bradley County Supervised Visitation Center and Safe Exchange Program. . . . She further admitted that she did not contact Mr. Wisdom until April of 2015, and further admitted that she had no visitation or contact with the child at all from 7/16/2012 through 8/11/2015.

The evidence in the record on appeal shows that even though Mother knew that she was entitled to supervised visitation with the Child, Mother waited three years before even attempting to set up visitation. The evidence in the record on appeal does not

preponderate against the Trial Court's finding that Mother's attempts to set-up visitation after April of 2015 were minimal.  We find no error in the Trial Court's finding by clear and convincing evidence that grounds existed to terminate Mother's parental rights to the Child for abandonment by willful failure to visit.

We next address Mother's issue regarding whether the Trial Court erred in finding persistent conditions existed, which were not likely to improve as to Mother.  We are puzzled as to why Mother raises this as an issue.  The Trial Court made no findings with regard to persistent conditions.  Nor did the Trial Court attempt to terminate Mother's parental rights based upon the ground of persistent conditions.  In her brief on appeal Mother cites to nowhere within the Trial Court's order where the Trial Court made any findings with regard to persistent conditions.  This issue is without merit.

Finally, we consider whether the Trial Court erred in finding that it had been proven that it was in the Child's best interests for Mother's parental rights to be terminated.  With regard to making a determination concerning a child's best interests, our Supreme Court recently instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i).  These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis.  *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).  Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."  *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]."  *Id*.  When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective."  *In re Audrey S*., 182 S.W.3d at 878.  Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  *Id*.  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36-1-101(d) (2017).

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors.  *In re Audrey S*., 182 S.W.3d at 878.

29

And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Trial Court considered all of the relevant statutory factors when making its determination about the Child's best interests and made specific findings with regard to this issue including:

Based upon all of the specific findings of fact set out above, the court finds that no meaningful relationship exists between this child and [Mother]. Furthermore, the court finds that this situation has been brought about by the willful actions of the mother.

The court finds, based upon all of the above, that this child would suffer emotional and psychological harm if there was a change of caregivers in her life at this point in time. The court finds this child has been away and outside of her mother's home since July of 2012, and the court finds that the child has been a part of the petitioner's family for a period of more than four years. The court finds, based upon both the petitioner and the child's testimony that there is a strong, loving and meaningful relationship between the child and the petitioner and the petitioner's family members. The court finds this child considers the petitioner's home as her home. The court finds that this child has become fully integrated in the petitioner's home and family, and has formed a

30

strong and positive bond with the petitioner and her immediate family. Based upon this, the court finds that this child would suffer both emotionally and psychologically if she were removed from the petitioner's home.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Trial Court's findings relative to best interests, and we find, as did the Trial Court, that this evidence amounted to clear and convincing proof that it was in the Child's best interests for Mother's parental rights to be terminated. We find no error in the Trial Court's determination that it was in the Child's best interests for Mother's parental rights to be terminated.

Having found that grounds for termination were proven by clear and convincing evidence and that it was proven that it is in the Child's best interests for Mother's parental rights to be terminated, we affirm the Trial Court's August 11, 2017 Final Order terminating Mother's parental rights to the Child. Mother's parental rights having been terminated, Mother lacks standing to challenge the petition for adoption of the Child.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Candy D., and her surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

31